Welch *v.* Louis et al.

THOMAS WELCH

*v.*

JOHN LOUIS *et al.*

1. STRIKING A CAUSE FROM THE DOCKET — *its effect* — *mode of bringing cause again before the court.* The striking of a cause from the docket does not place it so out of court and beyond its jurisdiction, but that it can be again brought .before the court in some mode. *Tibbs et al.* v. *Allen*, 29 Ill. 535, in which the mode of bringing the case again before the court is suggested.

2. Where all the parties to a suit in chancery have died since the cause was stricken from the docket, the course indicated by the practice in chancery by which to bring the case again before the court, is by bill, in the nature of a bill of revivor, by the heirs at law of one party against the heirs at law of the other party.

3. And the bill in such case, should progress to a hearing and decree, as in other cases.

4. Unless this course is pursued, or something equivalent to it, the court can have no jurisdiction of the case.

5. In this case, after a decree enforcing the specific performance of a contract in regard to a division of a tract of land between two claimants, and a commissioner appointed to execute deeds to the parties respectively., the cause was stricken from the docket. Six years afterwards both parties died. Four years after their death, the commissioner not having yet acted, and the cause being still off the docket, the court entered a decretal order that the commissioner convey to the heirs of the original parties respectively, which he did. *Held,* that these last proceedings in the court, after the cause was stricken from the docket, were *coram non judice,* and were not only irregular, but void ; and so, also, the deeds executed in pursuance of such proceedings, were void.

6. DECREE — *void for uncertainty.* In a suit to enforce the specific performance of a contract in regard to the division of a tract of land between two joint owners, the decree gave a certain specified portion first to one party, and then also decreed the same portion to the other party, and making no disposition of the residue of the tract. *Held,* the decree was void for uncertainty.

7. MASTER IN CHANCERY — *must act conformably to decree.* Where a commissioner appointed by a decree in chancery to convey land, departs materially from the directions in the decree, in his execution of the power, his acts, not being conformable to the decree, will be void.

8. POWERS — *naked powers must be strictly pursued.* A naked power must be strictly pursued, and a conveyance of land not authorized by the power, is a void conveyance.

9. Trespass upon land — *former occupancy, no defense.* One who has been an occupant of government land, but who has abandoned the premises, the title to the land having in the meantime become vested in a purchaser from the government, cannot set up his former occupancy as a defense against trespasses committed by him upon the premises after his abandonment.

10. Evidence — *declarations of party, when admissible.* In trespass *quare clausum fregit* by the owner of the land, the defendant set up his occupancy of that portion of the premises upon which the alleged trespass was committed ; the plaintiff endeavored to show an abandonment of such occupancy, by the defendant having moved off the fencing, etc., and it was held competent to prove the declarations of the defendant in that regard at the time he was removing the fence, as a part of the *res gestæ.*

11. Trespass upon uninclosed land — *what is sufficient title to sustain the action.* Action for trespass upon the uninclosed portion of a tract of land. The plaintiff showed a paper title to the whole, and actual possession and cultivation of part, claiming the whole tract. *Held,* to be sufficient evidence of title to the uninclosed part, to sustain the action.

12. Possession of uninclosed land — *of acts in reference thereto.* The plaintiff having such title, the occasional use of an undescribed part of the tract by the defendant, who occupied an adjacent farm, to place wood upon, and resorting to the bank of the river upon which it lay, for washing, picking up sticks of wood upon it, crossing over it to reach the river, are no possessory acts out of which a title could spring, sufficient to defeat that of the plaintiff.

Writ of Error to the Circuit Court of Tazewell county ; the Hon. James Harriott, Judge, presiding.

This was an action of trespass *quare clausum fregit* instituted in the court below by Thomas Welch against John Louis, Margaretta Louis and Mary L. Hammond. The defendants pleaded not guilty, and *liberum tenementum.*

The principal facts in the case will be found in the opinion of the court.

But a question arises as to the validity of certain proceedings in a suit in chancery, under which defendants claimed title to the *locus in quo,* which were had after the cause had been stricken from the docket, and after the original parties to the suit had died. Those proceedings will be understood from the following statement: It appears the suit in chancery was instituted in 1839, by John Florent Louis, the ancestor

of the defendants, against Francis Clement, from whom the plaintiff derives title, to enforce the specific performance of a written agreement which provided for a division between the contracting parties of a parcel of ground including the *locus in quo*. The suit progressed to a final decree, which was entered in 1841, directing a division of the land, and that each party should convey to the other the portion to which he was entitled under the decree. The parties refusing to execute that decree, at a subsequent term, the court directed the conveyances to be made by a commissioner appointed for that purpose. Afterwards, at the September term, 1842, the cause was stricken from the docket. No further proceedings were had in relation to that suit until April, 1852, when a decretal order was made in the cause, reciting that the commissioner had failed to execute the former decree, and that the original parties to the suit had died in 1848, leaving certain persons, who were named, as their heirs at law, respectively, and directed the same commissioner to execute conveyances to those heirs, respectively, according to the rights of their ancestors, as found in the decree rendered in 1841. At the same term the commissioner reported to the court that he had executed the conveyances to the heirs mentioned, as directed, and that report was entered of record. But it does not appear that the report was approved by the court.

The defendants claimed title under the deed executed to them by the commissioner under the authority mentioned.

All the other features of the case are set forth in the opinion of the court.

The trial in the court below resulted in a verdict and judgment for the defendants, and thereupon, Welch, the plaintiff, sued out this writ of error.

Messrs. COOPER & MOSS, for the plaintiff in error.

Mr. B. S. PRETTYMAN, for the defendants in error.

Mr. JUSTICE BREESE delivered the opinion of the Court.

This was an action of trespass to land, brought by the plaintiff against the defendants, in the Tazewell Circuit Court. To the action the defendants pleaded not guilty and a special plea, that the close, etc., was their soil and freehold. The jury found the issues for the defendants, and a judgment was rendered against the plaintiff for the costs. A motion for a new trial was made and overruled, a bill of exceptions signed, and the case brought here by a writ of error, and various errors assigned, which will be disposed of as we proceed.

The facts of the case appear to be substantially these. One Moushon, in 1832, entered upon the land including the *locus in quo*, while it belonged to the United States, and made some improvements in the north-west fractional quarter, and on the north-east fraction also. He built a stable and made a small field on the south part of the north-west, and a house on the south part of the north-east fractional quarter, on the east side of the road dividing the two fractions, and near the south line of the quarter. Moushon sold these improvements to Francis Clement, in 1834, who, thereupon, went into possession. Whilst Moushon occupied, the father of the defendants, John Florent Louis, lived with him, and made an improvement on the hill fraction, in the south half of the north-east quarter, and in the north-west corner, and east of the road; he built his house near the north line of the south half, and inclosed a small field of about two acres, on the west side of the road near his house. This field he cultivated one year. It was low ground, and the next year the water washed off most of the fence; Louis then removed the remainder, and used the rails in making a fence around a field on the east side of the road. It appears this road ran north and south on the line dividing the north-west from the north-east fractional quarter until near the north-west corner of the south half of this quarter, when it inclined to the east, and left about two acres of this tract west of the road.

The land was public land, and on the 26th of July, 1836,

Clement and John Florent Louis entered into a written agree-
ment, reciting that they had obtained from the Land Office
a certificate of purchase for the north-east fractional quarter;
and for the purpose of making a division of it between them,
Clement agreed to convey to Louis the north half of the
quarter, and Louis agreed to convey to Clement the south half,
" the intention being that each party shall retain his improve-
ments," and to effect that object, it was agreed that the land
should be surveyed, and if it was found by the survey that
Louis' improvement was on the south half of the quarter,
then it should be conveyed to him by Clement; and in return
therefor, Louis should convey to Clement an equal number of
acres out of the north half; and if any part of the improved
land of Clement should be found to be in the north half of
the quarter, then Louis was to convey it to him, taking himself
an equal quantity from the south half. They also agreed to
convey to each the improvement which each might have on
the small fraction of fourteen acres attached to the land
described in the agreement.

As was frequently the case about the time of this agree-
ment, parties who had proved up their pre-emption, so dis-
posed of their claims as to enable another party to make
payment and procure the certificate of purchase from the
United States, and which, we infer, was the course pursued
in this case, for one John W. Casey entered and purchased
the whole of the north fractional half of section twelve
containing one hundred and sixty-five and eighty one hun-
dredths acres, and, it is admitted by the parties to this suit,
became the undisputed owner thereof. Casey, on the 20th of
May, 1837, by deed of that date, duly recorded on the 2nd of
August, 1837, sold and conveyed the same to Clement.

Clement continued to occupy the south part of the north-
east fractional quarter, and of the field on the north-west
fractional quarter, cultivating it, taking wood from that part
of it not inclosed, and exercising such acts of ownership over
it as is usual and customary by owners or claimants of unoc-
cupied land, though his right was denied by Louis. After
his death, in July, 1848, his children and heirs at law, con-

tinued such occupancy, until the fifth of February, 1858, when they sold and conveyed, by deed of that date, to the plaintiff, the south half of the north-east quarter, containing seventy-five and fifty one hundredths acres, and the north-west fractional quarter, containing fourteen acres more or less, under which deed the plaintiff went into possession, and was in possession at the time of suit brought. John Florent Louis died in March, 1848, leaving these defendants, his heirs at law, who occupy as their ancestor did.

It appears that Louis, the ancestor of these defendants, had, in his lifetime and the defendants since his death, disputed the right of Clement to this fraction, and while it is not proved that they themselves ever exercised any unequivocal acts of ownership over it, they have prevented the plaintiff from extending his fields over the north part of the fraction, and from inclosing it for any purpose. It is in proof, no portion of the fraction north of plaintiff's field has ever been inclosed.

With a view to an exclusive appropriation of the north part of this small fraction, the plaintiff, before the commencement of this suit, commenced to build a paling fence on the east line of it with poles cut from this land, when the defendants interposed and tore it down. The design was, to inclose all the vacant portion of the fraction, which was prevented by the violent acts of the defendants. One year before, including the time laid in the declaration, it appears, that one of the defendants tore down the fence on the north side of the field in two different places; at one place near the river, where the plaintiff was repairing the damages occasioned by high water, in doing which, he placed his fence somewhat farther north than it had been, which Margaretta, one of the defendants, tore down. The other place was at the north-east corner of this field by the road, when the same defendant tore down several pannels of fence, — of the old fence which had been made by Moushon and had stood there at the time of the purchase by Clement and ever since. This field, inclosed in part by this fence, it appears, has been in the actual and undisturbed possession of the plaintiff and those under whom

he claims, for about twenty-six years, and at the point where the trespass was committed, the fence stood where it was placed before the sale to Clement in eighteen hundred and thirty-four.

These are the main facts of the plaintiff's case.

The defendants, to maintain the issues on their part, introduced as evidence, against the objection of the plaintiff, certain proceedings in chancery, originating in 1839, wherein John Florent Louis was complainant, and Francis Clement was defendant, and which, at the September term, 1839, resulted in an interlocutory decree.

The bill on which the decree was based, and which was the foundation of subsequent proceedings, sets out this agreement of July 26, 1836, and charges that it was agreed between the complainant and defendant, that there was a fraction of fourteen acres lying in front of complainant's land, that defendant agreed with complainant, in case whatever improvements he, complainant, had on that fraction, the defendant would convey to him, and alleges that as to this fractional tract of fourteen acres, the defendant, Clement, "is the sole owner thereof."

The object and scope of the bill was to obtain a specific performance of the agreement of July 26, 1836, as to the respective rights and claims of the parties to the north-east fractional quarter, and that this tract should be so divided between them, as that each party should have an equal quantity of land to include their respective improvements; the south half to be set off to the defendants, leaving thereout such portion of it as the complainant might have under improvement, and the north half to be set off to complainant, the defendants to be compensated out of it, for as much of the south half as complainant's improvements should cover.

There is an allegation in the bill, that the defendants designed to defraud complainant out of his improvements. The prayer of the bill is not quite intelligible, but we understand it to be, that Clement should be decreed to convey to complainant, so much of the south half of the north-east quarter as embraced complainant's improvements, in consider-

ation that complainant would first convey to the defendants an equal quantity out of the north half, and also prays that his improvement on the fraction of fourteen acres might be set off to complainant.

The bill was taken as confessed. We deem it unnecessary to notice the decree which followed, for the reason, it was, at the next April term, 1840, on motion of the defendant, vacated.

At the April term, 1841, another order and decree was entered, granting the prayer of the bill as to the north-east fractional quarter, and the respective improvements of the parties thereon, and it was further ordered, that the surveyors survey and ascertain how much land complainant had under improvement in 1836, and survey the second described fourteen acres, measure the land, and describe the same by metes and bounds. And the court appointed Lewis Prettyman surveyor, who was required to report his proceedings in the premises to the next term of the court.

At the next term, it being the September term, 1841, the complainant presented the report and survey of Mr. Prettyman, whereupon, the record recites, "it appearing to the court by the report of the surveyor, that the improvements Louis had on the south half of the north-east quarter, consists of a piece of land containing six and ten one hundredths acres, described by metes and bounds, that the surveyor has measured and set off in lieu of this land, the following land : commencing at the north-west corner of the above improvement of six and ten one hundredths acres ; thence north, one and seventy-eight one hundredths chains, to a stone ; thence east, thirty-four chains, to a stone ; thence south, one and seventy-eight one hundredths chains, to a post ; thence west, thirty-four chains, to the place of beginning ; containing six and five one hundredths acres." It also appearing by said surveyor's report, that the metes and bounds of the small fraction of land described in the interlocutory decree mentioned, are as follows : (here the metes and bounds are specified,) "containing twenty-one acres." It further appearing to the court that the complainant had, in 1836, an improve-

ment on the north part of the above fraction, as follows: (describing it by metes and bounds,) "containing two and fifty-two one hundredths acres."

The court being fully advised in the premises, orders and decrees, that the plaintiff convey to the defendants by deed, the following described land, to wit: the north half of the north-east fractional quarter of Section number 12, Town 25 north, Range 5 west; also, that the complainant shall convey to the defendant a private cart way across the north end of the land described as complainant's improvement, upon the complainant executing the deed as aforesaid; and the court doth decree, that the defendant convey to the complainant the following land, to wit: commencing at a post at the north-west corner black walnut 12 inches, bearing south eighty-one degrees, west twenty-eight links; thence south, nine and six one hundredths chains, to a stone; thence east, six and seventy-five one hundredths chains, to a stone; thence north, nine and six one hundredths chains, to a stone; thence west, six and seventy-five one hundredths chains, to the place of beginning; containing six acres and ten hundredths of an acre—also, the north half of the north-east fractional quarter of section number twelve, the said deed to be executed and delivered by the next term of this court, to which term the cause is continued.

At the April term, 1842, the next term in course, a further hearing was had, " and the report of Prettyman, a commissioner and surveyor, appointed by this court to survey and divide the fractional quarter of Section twelve, Township twenty-five north, Range five west of the third principal meridian, in Tazewell county, fairly and impartially between the parties aforesaid, having reference to a certain contract entered into between said parties, having been heard and approved: It is therefore considered by the court, (said parties to said contract having refused to convey to each other their separate portion, according to said contract contemplated,) that Peter Menard, Jr., be appointed a commissioner to execute and deliver to each of the said parties aforesaid, a good and sufficient deed in the partition of said land, having refer-

ence to said partition, division or survey of said land, made by said Prettyman, and to this court submitted, and now on files of this court, and that he make report of the same at the next term of this court."

At the September term following, on motion, it was ordered that the cause be stricken from the docket.

This is the state of the record up to the September term, 1842; and the question here arises, what was the condition of the cause when it was stricken from the docket — was it any longer in court, for the action of the court upon it? This question we discussed at some length in the case of *Tibbs et al.* v. *Allen*, 29 Ill. 535, and the conclusion there reached was, that the cause was not so out of court and beyond its jurisdiction, by striking it from the docket, but that it could be again brought before the court in some mode, and the mode suggested in that case, was, by motion and notice, or by petition, or supplemental bill, setting out the facts as they existed up to the time of the motion, or petition or bill.

By the death of these parties in 1848, the suit abated, making, in this respect, the case to differ from Tibbs' case. It is an anomaly in judicial proceedings, to carry on a suit in the name of the deceased parties to it. A bill, in the nature of a bill of revivor, by the heirs at law of one party against the heirs at law of the other party, is the course indicated by the practice in chancery in such cases. 3 Daniel's Ch. Pr. 1718.

The propriety of this is obvious, for although a deceased proprietor of lands may leave children, it does not follow they become entitled to his estate. He may have aliened it to other parties — he may have devised it in certain and unequal proportions to his children, or wholly, to strangers; hence the necessity of a bill to revive the proceedings wherein the complainants should show their estate in the land, and the defendants' claim, and by what right, so that they may have an opportunity to disclaim, or otherwise defend, according to the nature of their case.

By the death of these parties, new rights arose, of the nature of which, the court should be judicially informed by

bill, and the bill should progress to a hearing and decree as in other cases. Without this, or something equivalent to it, the court had no jurisdiction of the case, and the proceedings commencing in 1852, near ten years after the cause was stricken from the docket, and four years after the death of both parties, were not only irregular, but void. There was neither a cause in court, nor living parties to the cause, in which the Circuit Court undertook to act. The whole subject was *coram non judice*, and the report of the commissioner, and the deeds executed by him to the heirs at law of the deceased parties, should not have been received by the court. The action of the court, in these respects, was void and of no effect, and. they should not have been allowed to go in evidence.

But waiving this, and considering the proceedings in 1852, and the report and deeds regular, it will be seen on examination, the deeds do not conform to the decree, and are, for that reason, void and of no effect.

The decree, which was passed on the coming in of the surveyor's report, gives to the defendant the north half of the north-east fractional quarter, and also, in the last portion of it, decrees it to the complainant, and does not decree the south half to the defendant. It is therefore void for uncertainty. The deed gives the north half to complainant's heirs, and the south half to defendant's heirs. By the decree, the strip taken out of the north half and awarded to the defendant is described as bounded by lines, the initial point of which is at the north-west corner of complainant's improvements, on the south half, whereas by the deed, following the courses and distances given in it, not one of the lines would touch the north-west corner, but would only reach the north-east corner of the improvement. The decree does not find that the complainant, Louis, was entitled to any part or portion of the north-west fractional quarter of twelve, but only directs the surveyor to measure it, and ascertain what improvements the complainant had on it in 1836. This the surveyor did, and reported the area as twenty-one acres, and that complainant had on it in 1836 an improvement of two and fifty-two one

hundredths acres. The deed conveys to him not only this two and fifty-two one hundredths acres, but five and fifty-two one hundredths acres in addition.

It is unnecessary to cite authorities on the point, that a naked power must be strictly pursued, and that a conveyance of land not authorized by the power, is a void conveyance. The commissioner did not, by his deeds, carry out the decree, but materially departed therefrom, and his acts not being conformable to the decree, are void. These deeds were not approved by the court, so that no aid can be derived from that quarter. They stand upon their naked merits, and not being authorized by the decree, they must be considered as invalid, and inoperative to convey title.

A commissioner, like any other agent or attorney, must act according to the power conferred, and convey the land he is authorized to convey, and none other. The doctrine on this point is too well settled to require argument or authority.

Without adverting to, or discussing the objections made by the plaintiff to the introduction of these deeds, it is sufficient to say, the commissioner had no power by the decree to execute them, and they conveyed no title to the premises on which the trespass was committed.

The defendant also called one William Hammond as a witness, who stated that the defendants had occupied the land in dispute since 1848, that John Louis had a wood yard on a part of it, north of the field on the river, and he and the family have washed at the river. On his cross-examination he said, Louis and Clement had lawsuits about this land, and no part of the portion in dispute was under cultivation.

This was the defendants' case, whereupon the plaintiff, against the objection of the defendants, introduced in evidence certain other proceedings in chancery, commenced in 1850, by the heirs at law of John Florent Louis, these defendants, and the heirs at law of Clement and Peter Menard the commissioner, to correct certain errors in the original decree, and to revive and continue the original abated suit, praying to carry into effect the original decree, which we deem unnecessary to notice more particularly, inasmuch as the

29

bill, after being amended, and continued from term to term until 1853, was dismissed at the costs of the complainant. Whether this dismissal did, or did not, dispose of the original decree, is a question not essential to this case to be decided, as we are of opinion the plaintiff's case was fully made out by the proof he had adduced.

The plaintiff proved the trespasses to have been committed on land to which, by Casey's deed, and by the admissions of the defendants' ancestor, he had the title. Having the title, he had a perfect right to enclose the land, and a forcible disturbance of him in the exercise of that right, was a trespass. Some stress was laid upon a prior occupancy of a part of this north-west portion by John Florent Louis, and on an improvement made by him thereon, and which Clement agreed to convey to him. Saying nothing about this agreement, as being void for want of a consideration, it is quite evident he had no improvement on it in 1836, or at any other time. The proof is, he enclosed, while living with Moushon, about two acres of land west of the road, and it is proved, that a small portion of the south half of the north-east quarter is west of the road by reason of the road trending to the east just as it reaches the south-west corner of that tract, so that must have been the improvement, and no other. But if it was on the north-west fraction, he voluntarily abandoned it, by removing the rails, and it was competent for the plaintiff, in order to show an abandonment, to prove the declarations of Louis, when he was in the act of removing the fence. It was a part of the *res gestæ* — of the thing done — giving it character, showing the *animus* under which it was done. *Riggs* v. *Cook*, 4 Gilm. 336. The court erred in not permitting the plaintiff to have these declarations go to the jury. *Proctor* v. *Town of Lewiston*, 25 Ill. 153. It may be, he said he had no claim or title to the land, and he would therefore remove his fence. The weight of evidence is, however, that this improvement was not on the north-west fraction but upon the north-east.

The plat used in evidence in this cause, shows a strip of land west of the road, part of the north-east quarter, which

Welch *v.* Louis et al.

we infer was the tract which Louis improved and from which he removed the fence. All the witnesses concur in saying, that the part of the fraction north of plaintiff's field never was at any time enclosed.

The trespasses were committed on land to which the plaintiff shows a paper title and actual possession and cultivation of part, claiming the whole tract. This is sufficient evidence of title to the unenclosed part, to sustain the action. *Davis* v. *Early et al.*, 13 Ill. 192, and cases there cited.

The commissioner's deed to defendants being void, they are left without a leg to stand upon. No possession of any portion of this tract, by defendants or their ancestor, has been shown. The occasional use of an undescribed part of it, to place wood upon, and resorting to the bank for washing, picking up sticks of wood upon it, crossing over it to reach the river, are no possessory acts out of which a title can spring, sufficient to destroy the title shown by the plaintiff.

It is also in proof, that the plaintiffs, or those under whom they claim, have paid taxes on this fraction, for a series of years. It is described as containing but fourteen and one-fourth acres, but upon survey, it is found to contain twenty-one acres. The defendants show no payment of taxes on any part of the fraction.

We deem it unnecessary to comment upon the instructions given and refused, as the views we have expressed dispose of them substantially, so that on another trial, the Circuit Court will give such instructions, should it be moved to do so, in harmony with this opinion.

The judgment of the Circuit Court is reversed, and the cause remanded for a new trial, and for further proceedings not inconsistent with this opinion.

*Judgment reversed.*